# Exhibit "B"

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU
---------------------------------------------------------------X
PATRICK CREAVEN

                              Plaintiff(s),

             -against-

STEPHEN ERICKSON

                              Defendants.
---------------------------------------------------------------X

Index No.:

The Basis of Venue is:

Location of Transaction

**Summons**

Location of Transaction:
127 Garden St
Garden City, New York 11530

**TO THE ABOVE NAMED DEFENDANTS:**

        You are hereby summoned and required to serve upon plaintiffs' attorney an

answer to the complaint in this action within 20 days after the service of this summons, exclusive

of the day of service (or within 30 days after the service is complete if this summons is not

personally deliver to you within the State of New York); and in case of your failure to appear or

answer, judgment be taken against you by default for the relief demanded herein.

Dated: September  6 , 2018

                                            Yours, etc.
                                **LAW OFFICE OF GERARD M. MARRONE**

                                By:     GERARD MARRONE
                                *Attorney for Plaintiff*
                                6685 73rd Place, Second Floor
                                Middle Village, NY 11379
                                718.261.1711

Defendants' Addresses:
Stephen Erickson
127 Garden Street
Garden City, NY 11530

SUPREME COURT OF THE STATE OF NEW YORK
NASSAU COUNTY

— — — — — — — — — — — — — — — — — — — — — — — — —x

PATRICK CREAVEN,                      :    Index No.:

                Plaintiff,      :

                      :

      -against-         :    **COMPLAINT**

                      :

STEPHEN ERICKSON,             :

                      :

                Defendant.    :

— — — — — — — — — — — — — — — — — — — — — — — — —x

       Plaintiff Patrick Creaven ("Plaintiff" or "Creaven"), by and through his attorneys, The Law Office of Gerard M. Marrone, P.C., for his Complaint against Defendant Stephen Erickson ("Defendant" or "Erickson"), alleges the following:

<b><u>INTRODUCTION</u></b>

       1.    This is a breach of contract action arising out of Erickson's breach of a letter agreement with Creaven dated December 26, 2008 (the "Agreement"). The Agreement was given in consideration of Creaven's substantial equity investment in and loan to EnablePay Direct, Inc. ("EnablePay"), which was a company that Erickson and Creaven co-founded and that provided merchant payment processing services. Under the Agreement, in the event that EnablePay ceased operations, and for a period of ten years thereafter, if Erickson received equity interests in a company that provides similar services to EnablePay—what the Agreement defines as a Similar Business—then Erickson was obligated, *inter alia*, to provide Creaven with the same interests in the Similar Business as Erickson received and to use his best efforts to ensure that Creaven received employment in the Similar Business that was comparable to his role as General Counsel and Executive Vice President of EnablePay.

2.      In April 2012, EnablePay sold its assets to Midland States Banks, Inc. ("MSB") pursuant to an Asset Purchase Agreement ("APA"). MSB was a Similar Business under the Agreement as it provided essentially the same services as EnablePay.

3.      As part of that transaction, MSB provided Erickson with an agreement to deliver 25,000 stock options in MSB which, when vested (the "Erickson Options"), would be exercisable for 25,000 shares of MSB stock (the "Erickson Stock") at a strike price of $16.00 per share. Initially, MSB also provided Creaven with an agreement to deliver 20,000 stock options which, upon vesting (the "Creaven Options"), would be exercisable for 20,000 shares of MSB stock (the "Creaven Stock"). Erickson and Creaven also become employees of MSB, with Erickson becoming the President of its merchant services division, and Creaven serving as a Director in that division reporting to Erickson.

4.      Shortly after the closing of the APA, however, Erickson engaged in a pattern of actions to circumvent industry-wide risk and underwriting standards that MSB was obligated to follow. When Creaven questioned and resisted Erickson's attempts to circumvent these standards, Erickson terminated Creaven from MSB without cause in January 2014. As a result of Erickson's actions terminating Creaven from MSB, the Creaven Options that Creaven initially received in connection with the APA, which had not yet vested, were rendered unexercisable.

5.      In May 2014, EnablePay ceased its operations. Notwithstanding Erickson's obligations in the Agreement following EnablePay's cessation of operations to provide Creaven with the same equity interests he receives in a Similar Business, i.e., MSB, Erickson has failed to provide Creaven with the same interests that Erickson subsequently received in MSB and failed to use his best efforts to ensure that Creaven is employed by MSB.

2

6.      Accordingly, Creaven brings this action to recover what he is rightfully entitled to under the Agreement.

## PARTIES, JURISDICTION AND VENUE

7.      Plaintiff Patrick Creaven is an individual residing at 140 Kildare Road, Garden City, New York 11530.

8.      Defendant Stephen Erickson is an individual residing at 17237 Forest Hills Drive, Effingham, Illinois 62401.

9.      This Court has personal jurisdiction over Defendant and venue is proper in this Court because the parties consented to jurisdiction in the Agreement and agreed that "any dispute arising from or related to the Agreement shall be resolved in state or federal courts located in Nassau County, New York." (*See* Ex. A, p. 3.)

## GENERAL ALLEGATIONS

**Background**

10.      EnablePay was a company that provided card and other electronic payment processing services to merchants, including the procurement of merchant customers, the purchasing of sales drafts, the development and operation of the systems, personnel, and tools to provide such services.

11.      Erickson was the Co-Founder, President, and Chief Executive Officer of EnablePay.

12.      In 2007 and 2008, Erickson sought funding from Creaven in order to establish EnablePay.    During that time period, Creaven provided $410,000 in equity financing to EnablePay and became a Co-Founder.

3

13.     Creaven also became EnablePay's General Counsel and Executive Vice President. Despite his significant contributions in those roles, Creaven was mostly uncompensated for his work as General Counsel and Executive Vice President.

14.     Late in 2008, EnablePay required additional financing in order to avoid all but certain bankruptcy.  With no other potential source of financing available, Erickson approached Creaven for an additional investment in EnablePay.  Though Creaven was under no obligation to provide additional financial assistance to EnablePay, Creaven agreed to and did provide $195,000 secured debt financing.

15.     Without Creaven's contributions—financial and otherwise—EnablePay would not have survived.  Because of Creaven's assistance, however, EnablePay over the next few years was able to develop into a viable business that attracted the interest of potential business partners, including MSB.

**The Agreement**

16.     As consideration for Creaven's extraordinary financial and other support to both Erickson and EnablePay, Erickson and Creaven entered into the Agreement on or about December 26, 2008.  (*See* Ex. A.)

17.     Erickson acknowledged in Annex A to the Agreement that Creaven invested $410,000 in EnablePay and loaned $195,000 to EnablePay.  (*Id*., at Annex A.)

18.     The term of Erickson's obligations under the Agreement is "upon and following the date [EnablePay] is dissolved or ceases operations for any reason, and for a period of ten (10) years thereafter."  (*Id.,* at p. 1.)

4

19.     Under the Agreement, Erickson agreed that from and after the date EnablePay ceased operations he was not to obtain any equity interests in a Similar Business to EnablePay unless and until Creaven received the same interests in the Similar Business.

20.     Specifically, paragraph A of the Agreement provides that "at any time upon and following the date the Company is dissolved or ceases operations for any reason, and for a period of ten (10) years thereafter" neither Erickson, nor any members of his family, were to receive any interests in a Similar Business, "unless and until [Creaven]…is provided the opportunity to receive: (i) in respect of amounts invested by [Creaven] in the Company, the same Interests (and class thereof) as [Erickson's] Interests in such Similar Business; and (ii) in respect of amounts loaned by [Creaven] to the Company, (x) the same Interests (and class thereof) as [Erickson's] Interests in such Similar Business…." (*Id.*, at § A.)

21.     The Agreement further provides that the entire amount invested in and/or loaned to EnablePay by Creaven, i.e., $605,000 (which consists of the $410,000 investment and $195,000 loan), "shall be credited toward the receipt, purchase and/or grant of" interests in a Similar Business to Creaven.  (*Id.*, at § B.)  Thus, the Agreement contemplated that rather than Creaven having to pay out of pocket for the interests in a Similar Business that Erickson was obligated to provide, the value of Creaven's equity investment in EnablePay and/or the amount of the loan to EnablePay was to be credited towards the purchase cost of any such interests.

22.     To avoid dilution of Creaven's equity investment of $410,000 in EnablePay, the allocated value of his equity investment to be credited towards the purchase cost of the interests in a Similar Business is to be no less than the value of the interests Erickson receives in any Similar Business. (*Id.*)

5

23.     Erickson represented in the Agreement that he "shall require such other interested parties, investors and potential investors to agree to allocate and value the Interests of the Creaven Parties in such Similar Business in accordance with the terms of this letter agreement." (*Id.*, at § C.)

24.     Erickson was also obligated under the Agreement to use his "best efforts to obtain a position for [Creaven] in the Similar Business comparable to the position held by him with the Company, with similar responsibilities, and at a level of compensation in relation to [his] that is similar to that which existed at [EnablePay]…." (*Id.*, at § D.)

**The Sale of EnablePay to MSB**

25.     On or about April 4, 2012, EnablePay entered into an APA with MSB, whereby MSB purchased  EnablePay's assets.

26.     In connection with the APA, Erickson was hired by MSB as President of its merchant services division.  Creaven was initially hired by MSB as a Director in MSB's merchant services division reporting to Erickson.

27.     Erickson and Creaven also retained their respective positions with EnablePay, and EnablePay was to continue operations in its Albertson, New York offices until such time that all corporate functions could be wound down and the New York operations consolidated at MSB's headquarters in Effingham, Illinois.

28.     Also in connection with the APA, Erickson and Creaven were promised options and stock interests from MSB, although only Erickson received vested and exercisable options and stock interests from MSB.  Specifically, following a four year vesting period Erickson received the Erickson Options (25,000 MSB stock options), which would be exercisable for the Erickson Stock (25,000 shares of MSB stock).  Upon information and belief, in 2018 Erickson

6

has begun exercising the Erickson Options and has begun receiving Erickson Stock. Creaven was also promised 20,000 MSB stock options, however he was terminated by Erickson without cause prior to the conclusion of the four year vesting period and therefore never received vested and exercisable Creaven Options or the Creaven Stock (20,000 shares of MSB stock). The strike price for these options was $16.00 per share.

29.    As a result of the APA, MSB's merchant services division, and MSB as the owner of EnablePay's assets, is a Similar Business as contemplated by the Agreement.

**Erickson Terminates Creaven from MSB**

30.    Following the execution of the APA, Creaven made several inquiries of Erickson about certain EnablePay funds in his control and which he retained, and about the status of certain obligations of MSB under the APA.

31.    In response, Erickson began interfering with the independent risk management and underwriting duties essential to Creaven's employment with MSB, including attempts by Erickson to circumvent or to cause Creaven to circumvent (which he appropriately refused), industry-wide risk and underwriting standards that MSB was obligated to follow and which were vital to the security of MSB.

32.    Thereafter, in or about December 2013, Erickson notified Creaven that if he did not resign from his position as Director of MSB, then Erickson would terminate him without cause effective January 15, 2014.

33.    Creaven refused to resign. Instead, Creaven notified his and Erickson's superiors at MSB of Erickson's attempted violations of the risk and underwriting standards and interference with Creaven's risk and underwriting duties.

7

34.     On or about January 15, 2014, Erickson terminated Creaven from MSB without cause.

**Erickson Breaches the Agreement**

35.     As a result of Erickson's termination of Creaven without cause on January 15, 2014, the MSB stock options promised to Creaven would never vest and would never be exercisable, thus depriving Creaven of any opportunity to receive either the Creaven Options or the Creaven Stock.

36.     Thereafter, in or about May 2014, Erickson closed the New York Office of EnablePay and terminated the last remaining employee in New York who worked on EnablePay matters. Thus, at this point in 2014, EnablePay ceased operations.

37.     Subsequently, Erickson received the Erickson Options, on or about May 2016, which are exercisable for the Erickson Stock (i.e., 25,000 shares of MSB stock at a strike price of $16.00 per share). Upon information and belief, in 2018 Erickson has begun exercising the Erickson Options and has begun receiving Erickson Stock.

38.     Further, following the cessation of EnablePay's operations Erickson has refused, in breach of his obligations under the Agreement, to provide Creaven with the opportunity to receive the same equity interests in MSB that Erickson received.

39.     By letter dated February 28, 2017, Creaven, through counsel, demanded that Erickson honor his obligations under the Agreement to provide the same interests as Erickson has in MSB.

40.     To date, however, in breach of his obligations under the Agreement, Erickson has refused to provide Creaven with the same interests that Erickson has in MSB.

8

FILED: NASSAU COUNTY CLERK 09/13/2018 02:10 PM          INDEX NO. 612407/2018

NYSCEF DOC. NO. 16   Case 2:19-cv-00330   Document 1-2   Filed 01/16/19   Page 11 of 23 PageID #: 16   RECEIVED NYSCEF: 09/13/2018

## AS AND FOR A FIRST CAUSE OF ACTION

(Breach of Contract – Failure to Provide Equal Interests in a Similar Business)

41.     Creaven incorporates the allegations of Paragraphs 1 through 40 above as if fully set forth herein.

42.     Creaven and Erickson are parties to the Agreement.

43.     Creaven fully performed all of his obligations under the Agreement.

44.     The Agreement provides, *inter alia*, that for a period of ten years following the date that EnablePay ceases operations, Erickson is obligated to provide Creaven with the same equity interests that Erickson receives from any business which is similar to EnablePay.  (*Id.*, at § A(i)-(ii).)

45.     Under the APA, MSB's merchant services division, and MSB as the owner of EnablePay's assets, is a Similar Business as contemplated by the Agreement.

46.     Erickson's termination of Creaven from MSB without cause on January 15, 2014, meant the MSB stock options promised to Creaven would never vest and would never be exercisable, and deprived Creaven of any opportunity to receive either the Creaven Options or the Creaven Stock.

47.     Thereafter, EnablePay's operations ceased in or about May 2014.

48.     Subsequently, Erickson received the Erickson Options, on or about May 2016, which are exercisable for the Erickson Stock (i.e., 25,000 shares of MSB stock at a strike price of $16.00 per share).  Upon information and belief, in 2018 Erickson has begun exercising the Erickson Options and has begun receiving Erickson Stock.

49.     Moreover, from and after the cessation of EnablePay's operations Erickson has refused, in breach of his obligations under Subsection A of the Agreement, to provide Creaven with the opportunity to receive the same equity interests in MSB that Erickson has received.

9

50.     Pursuant to the Agreement, "in the event of a breach of any provision of this letter agreement, the aggrieved party shall be entitled to specific performance of this letter agreement…, in addition to any other remedy to which such aggrieved party may be entitled at law or in equity…" (*Id.*, at p. 3.)

51.     Accordingly, as a result of Erickson's breach of the Agreement, Creaven is entitled to damages in an amount to be determined at trial but in no event less than $400,000.

52.     Alternatively, Creaven is entitled to specific performance of the transfer of Erickson's 25,000 fully-vested MSB stock options immediately exercisable by Creaven with no other changes in terms to the options, or 25,000 shares of MSB stock that are not subject to any restrictions or other encumbrances (plus any additional vested MSB stock options and/or MSB shares Erickson has received from and after the cessation of EnablePay's operations).

## AS AND FOR A SECOND CAUSE OF ACTION
(Breach of Contract – Failure to Cause the Similar Business to Allocate the Value of Creaven's Investment in EnablePay)

53.     Creaven incorporates the allegations of Paragraphs 1 through 52 above as if fully set forth herein.

54.     Creaven and Erickson are parties to the Agreement.

55.     Creaven fully performed all of his obligations under the Agreement.

56.     Under the Agreement, the entire amount Creaven invested in and/or loaned to EnablePay, i.e., $605,000 (which consists of the $410,000 invested and $195,000 loan), "shall be credited toward the receipt, purchase and/or grant of" interests in a Similar Business to Creaven. (*Id.*, at § B.)  Thus, the Agreement contemplated that rather than Creaven having to pay out of pocket for the interests in a Similar Business that Erickson was obligated to provide, the value of

10

Creaven's equity investment in EnablePay and/or the amount of the loan to EnablePay was to be credited towards the purchase cost of such interests.

57.     To avoid dilution of Creaven's equity investment of $410,000 in EnablePay, the allocated value of his equity investment to be credited towards the purchase cost of the interests in a Similar Business is to be no less than the value of the interests Erickson receives in any Similar Business. (*Id.*)

58.     The total exercise price for the 25,000 MSB options or the related shares of MSB stock to be transferred to Creaven is $400,000.

59.     In breach of Erickson's obligations in the Agreement, he has failed to cause MSB (a Similar Business in which he has an interest), to allocate the value of Creaven's equity investment toward the purchase of the same interests in MSB (i.e., 25,000 fully-vested options for MSB stock or 25,000 shares of MSB stock, plus any additional vested MSB stock options and/or MSB shares Erickson has received from and after the cessation of EnablePay's operations) that Erickson is obligated to provide Creaven.

60.     As a result of Erickson's breach of the Agreement, Creaven has been damaged in an amount to be determined at trial, but in no event less than $400,000.

## AS AND FOR A THIRD CAUSE OF ACTION
(Breach of Contract – Failure to Use Best Efforts to Obtain a Position for Creaven with MSB)

61.     Creaven incorporates the allegations of Paragraphs 1 through 60 above as if fully set forth herein.

62.     Creaven and Erickson are parties to the Agreement.

63.     Creaven fully performed all of his obligations under the Agreement.

64.     Erickson was obligated under the Agreement to use his "best efforts to obtain a position for [Creaven] in the Similar Business comparable to the position held by him with the

11

Company, with similar responsibilities, and at a level of compensation in relation to [his] that is similar to that which existed at [EnablePay]....” (*Id.*, at § D.)

65.     Following the closing of the APA, Erickson was hired by MSB as President of its merchant services division.  In 2018, Erickson was promoted to Chief Financial Officer of MSB.

66.     In breach of Erickson’s obligation under the Agreement, as the President of MSB’s merchant services division, he failed to use best efforts to ensure that Creaven was employed by MSB.

67.     Instead, Erickson terminated Creaven from his position as a Director in MSB’s merchant services division without cause in January 2014 in response to Creaven raising issues concerning Erickson’s attempt to, *inter alia*, circumvent or to cause Creaven to circumvent, industry-wide risk and underwriting standards that MSB was obligated to follow and which were vital to the security of MSB.

68.     As a result of Erickson’s actions depriving Creaven employment in MSB in breach his obligations under the Agreement, Creaven has been damaged in an amount to be determined at trial, but in no event less than $191,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
(Breach of the Implied Covenant of Good Faith and Fair Dealing)

69.     Creaven incorporates the allegations of Paragraphs 1 through 68 above as if fully set forth herein.

70.     As in every contract, the Agreement contains an implied covenant of good faith and fair dealing, which prohibits each contracting party from doing anything to prevent the other party to the contract from receiving benefits and entitlement of the contract and imposes the duty of good faith performance of the contract.

12

71.     The Agreement was entered into by Erickson in consideration of Creaven providing financial assistance to EnablePay, without which EnablePay – the company co-founded by Erickson and Creaven – would not have survived and would not have entered into the APA.

72.      In connection with the sale of EnablePay's assets to MSB pursuant to the APA, Erickson became employed by MSB and was promised options and stock interests from MSB, and he subsequently received the Erickson Options, fully vested, which became exercisable for the Erickson Stock. Upon information and belief, in 2018 Erickson has begun exercising the Erickson Options and has begun receiving Erickson Stock.

73.     Creaven also initially became employed by MSB, reporting directly to Erickson, and was also promised options and stock interests from MSB.

74.     Implied in the Agreement was that Erickson would not do anything to deprive Creaven from remaining employed by MSB and from receiving the same equity interests in MSB that Erickson received.

75.     Erickson breached this implied obligation by terminating Creaven without cause from his position as a Director in MSB's merchant services division, thus depriving Creaven of any opportunity to receive either the Creaven Options or the Creaven Stock.

76.     As a result of Defendant's breach of the implied covenant of good faith and fair dealing implicit in the Agreement, Creaven has been damaged in an amount to be determined at trial.

**WHEREFORE,** Plaintiff Patrick Creaven demands that this Court enter judgment in his favor and against Defendant Stephen Erickson, as follows:

13

A.    On his First Cause of Action, damages in an amount to be determined at trial, but in no event less than $400,000 plus interest, or, alternatively, specific performance requiring the immediate transfer of the Erickson Options or Erickson Stock to Creaven;

B.    On his Second Cause of Action, damages in an amount to be determined at trial, but in no event less than $400,000 plus interest;

C.    On his Third Cause of Action, damages in an amount to be determined at trial, but in no event less than $191,000, plus interest;

D.    On his Fourth Cause of Action, damages in an amount to be determined at trial;

E.    Plaintiff's costs and disbursements of this lawsuit; and

F.    Such other and further relief as this Court deems just and proper.

Dated:    ~~August __~~, September 6, 2018

Law Office of Gerard M. Marrone, P.C>

By:

Gerard M. Marrone

66-85 73rd Place
Second Floor
Middle Village, New York 11379
718.261.1711

*Attorneys for Plaintiff Patrick Creaven*

14

———— NOTICE OF ENTRY ————

Sir:-Please take note that the within is a *(certified)* true copy of
duly entered in the office of the clerk of the within named court on

Dated:

Yours, etc.,

**LAW OFFICE OF GERARD MARRONE, P.C.**
**66-85 73rd Place, 2nd Floor**
**Middle Village, NY 11378**
**T: 718.261.1711**
**F: 347.813.4985**

To

Attorney(s) for

———— NOTICE OF SETTLEMENT ————

Sir:-Please take notice that an order

of which the within is a true copy will be presented for settlement to the Hon.
one of the judges of the within named Court, at

on

at                          M.
Dated:

Yours, etc.,

**LAW OFFICE OF GERARD MARRONE, P.C.**
**66-85 73rd Place, 2nd Floor**
**Middle Village, NY 11378**
**T: 718.261.1711**
**F: 347.813.4985**

TO

Attorney(s) for

---

Ind. No.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

PATRICK CREAVEN

Plaintiff(s),

-against-

STEPHEN ERICKSON

Defendant(s).

COMPLAINT

**LAW OFFICE OF GERARD MARRONE**
**P.C.**
**66-85 73rd Place, 2nd Floor**
**Middle Village, NY 11378**
**T: 718.261.1711**
**F: 347.813.4985**

To
Attorney(s) for

Service of a copy of the within is hereby admitted.

Dated:

Attorney(s) for

INDEX NO. 612407/2018
RECEIVED NYSCEF: 09/13/2018

Case 2:19-cv-00330   Document 1-2   Filed 01/16/19   Page 18 of 23 PageID #: 22

# EXHIBIT A

Stephen A. Erickson
127 Garden Street
Garden City, NY 11530
December 26, 2008

Patrick M. Creaven
140 Kildare Road
Garden City, NY 11530

       Re:    EnablePay Direct and Future Similar Businesses

Dear Patrick:

          For purposes of this letter agreement, "Similar Business" shall mean the following activities: (x) the provision of credit card services to merchants, including the procurement of merchant customers, the purchasing of sales drafts, the maintenance of merchant accounts, and the development and operation of the systems, personnel and tools to provide such services, and the storing, finding, importing and organizing information and data related thereto, and the development of computer software and internet content and connectivity to enable communication with external systems (including, without limitation, front-end processors, back-end processors and other third-party service providers) and (y) any other business or activity in which EnablePay Direct, Inc. or its predecessor entity (collectively, the "Company") is or was engaged on or prior to the date of this letter agreement.  For purposes of this letter agreement, a Similar Business shall include any parent, subsidiary or affiliated entity that owns, or is under the common control or ownership of, an entity that engages in the activities described above.

          In consideration of the extraordinary financial and other support provided by Patrick M. Creaven to me and the Company, at any time upon and following the date the Company is dissolved or ceases operations for any reason, and for a period of ten (10) years thereafter, I understand and agree that:

          (A)    I and members of my family, or any entity in which I have an ownership or beneficial interest, will not (directly or indirectly) become investors in, or a registered or beneficial owners of any class of capital stock, membership or other interests (including warrants, options or any similar interests) in, any Similar Business (such interests in a Similar Business, the "Interests") unless and until Patrick M. Creaven, his heirs or successors, or an entity in which he has an ownership or beneficial interest (each individually and collectively, the "Creaven Parties"), is provided the opportunity to receive: (i) in respect of amounts invested by Patrick M. Creaven in the Company, the same Interests (and class thereof) as my Interests in such Similar Business; and (ii) in respect of amounts loaned by Patrick M. Creaven to the Company, (x) the same Interests (and class thereof) as my Interests in such Similar Business and/or (y) the same Interests purchased or received by other investors in such Similar Business (in the sole discretion of Patrick M. Creaven); *provided, however,* that the foregoing shall not prohibit me from becoming the registered or beneficial owner of up to five percent (5%) of any class of the capital stock, membership or other interests (including warrants,

options or any similar interests) of a Similar Business if I am then employed as an executive of such Similar Business and such interests are awarded as part of a compensation plan available to other executives and management of such Similar Business and in amounts consistent with other participants in such plan;

(B)     the entire amount invested and/or loaned by Patrick M. Creaven to the Company on and prior to the date of this letter agreement (the amounts invested in and/or loaned to the Company by Patrick M. Creaven are set forth on Annex A to this letter agreement and are not in dispute) shall be credited toward the receipt, purchase and/or grant of such Interests to any of the Creaven Parties as described in subparagraph (A) above, and such Interests of the Creaven Parties in any such Similar Business shall be allocated and valued as follows (as applicable after operation of subparagraph (A) above): (i) in respect of amounts invested by Patrick M. Creaven in the Company, at *no less than* the valuation of my Interests in such Similar Business, (ii) in respect of the principal amount loaned by Patrick M. Creaven to the Company, at the *greater of* the valuation of my Interests and the Interests of such other investors in such Similar Business (as determined in the sole discretion of any of the Creaven Parties) and (iii) in respect of interest on the amount loaned by Patrick M. Creaven, at the *lesser of* the valuation of my Interests and the Interests of such other investors in such Similar Business;

(C)     I will represent the Creaven Parties (or any of them) as a founder and as an investor in any such Similar Business to any other interested parties, investors or potential investors in such Similar Business, and shall require such other interested parties, investors and potential investors to agree to allocate and value the Interests of the Creaven Parties in such Similar Business in accordance with the terms of this letter agreement;

(D)     I shall notify the Creaven Parties reasonably advance of any meetings or conferences with any other interested parties, investors or potential investors in such Similar Business, and the Creaven Parties (or any of them) and their counsel or designees shall be entitled to participate in any and all such meetings and conferences (in person or by telephone); and

(E)     I will use my best efforts to obtain a position for Patrick M. Creaven in the Similar Business comparable to the position held by him with the Company, with similar responsibilities, and at a level of compensation in relation to mine that is similar to that which existed at the Company (it being understood that this subparagraph (E) shall operate only in the context of a Similar Business in which I have or seek to have an Interest).

Nothing in this letter agreement shall operate to restrict me from being employed by or acting as a consultant to, or being a director, officer, employee or agent of any Similar Business.

The parties hereto each acknowledge and agree that in the event of any breach of this letter agreement, the non-breaching party or parties would be irreparably

harmed, no adequate remedy at law would exist and damages would be difficult to determine. It is accordingly agreed that (x) in the event of a breach of any provision of this letter agreement, the aggrieved party shall be entitled to specific performance of this letter agreement and to enjoin any continuing breach of this letter agreement (without the necessity of proving actual damages and without posting bond or other security), in addition to any other remedy to which such aggrieved party may be entitled at law or in equity, and (y) each of parties hereto will waive the defense in any action for specific performance or other equitable relief that a remedy at law would be adequate.

This letter agreement shall be governed by and construed in accordance with the laws of the State of New York. The parties hereto each agree that any dispute arising from or related to this letter agreement shall be resolved in state or federal courts located in Nassau County, New York. The parties hereto each waive any objection they may have to the location of the court and consent to jurisdiction, and each agree to waive their rights to a jury trial and hereby consent to a bench trial without a jury. This letter agreement (which shall include Annex A hereto) constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and shall supersede and replace any and every preexisting contract, agreement, representation, discussion and negotiation between the parties hereto which is not specifically incorporated herein. Any modification, alteration, or deviation from the terms of this letter agreement must be in writing and signed by each of the parties hereto.

Please sign the acknowledgement below to confirm our understanding as set forth in this letter agreement.

Very truly yours,

Stephen A. Erickson

ACCEPTED AND AGREED:

Patrick M. Creaven

3

## Annex A

| Amount invested by Patrick M. Creaven in the Company: | $410,000 |
|---|---|
| Amount loaned by Patrick M. Creaven to the Company: | $195,000 plus interest at 12% per annum, capitalized on October 16th of each calendar year |

4

## Supreme Court Of The State Of New York, County Of Nassau

**Patrick Creaven,**
          **Plaintiff(s),**                    **CASE NO.: 612407 18**
**vs.**

**Stephen Erickson,**
          **Defendant(s).**



For:
**Gerard M Marrone Law Office**

### AFFIDAVIT OF SERVICE

Received by Meador Investigations, to be served on:

<u>Stephen Erickson, 17237 Forest Hills Dr , Effingham, IL 62401.</u>

I, <u>Brent Bohnhoff</u>, being first duly sworn on oath, depose and say the following:

I Served, on <u>December 13, 2018 at 8:11 PM</u> the within

<u>Summons and Complaint; Notice of Electronic Filing</u> In accordance with state statutes in the manner indicated below:

**INDIVIDUAL SERVICE:** Served the within-named person.

**At 17237 Forest Hills Dr , Effingham, IL 62401.**

Description of person accepting service:

| Sex | Skin | Hair | Age | Height | Weight |
|-----|------|------|-----|--------|--------|
| Male | Caucasian | Brown | 50 - 60 | 6'02" | 170 |

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.

Service Fee: <u>$75.00</u>

Signed and sworn to before me on
this 14th day of December, 2018.

_____
NotaryPublic

CHARITY BOHNHOFF
Official Seal
Notary Public - State of Illinois
My Commission Expires Nov 2, 2020

SERVED BY:_____
Process Server Number: 129-291325
Meador Investigations
PO Box 157
Lincoln, IL 62656
217.732.1585
IL Lic#117-001077

*353137*